THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. OCTAVIANO MARUNGO, Defendant-Appellee.

Second District    Nos. 2—02—1069, 2—02—1070 cons.

Opinion filed November 21, 2003.

Meg Gorecki, State's Attorney, of St. Charles (Martin P. Moltz and Gregory

L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Jennifer W. Stock, of Law Offices of Kathleen Colton, Ltd., of Batavia, for appellee.

JUSTICE BYRNE delivered the opinion of the court:

In case No. 01—CF—3161, defendant, Octaviano Marungo, was indicted for two counts of unlawful use of a weapon within 1,000 feet of a school or park (720 ILCS 5/24—1(c)(1.5) (West 2000)), and three counts of unlawful use of a weapon (720 ILCS 5/24—1(a)(4) (West 2000)). In case No. 01—CF—3614, defendant was indicted for the offenses of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(c)(2) (West 2000)) and unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2000)). Defendant filed a motion to quash arrest and suppress evidence in each case. The trial court denied each motion on May 29, 2002, following an evidentiary hearing. Defendant moved for reconsideration in light of this court's recent decision of *People v. White*, 331 Ill. App. 3d 22 (2002), which was filed on May 24, 2002. The trial court reversed each order and granted defendant's motions. The State appeals in both cases, contending that the trial court erred in applying *White* and granting defendant's motions to quash arrest and suppress evidence. We consolidated the appeals, and for the following reasons, now affirm.

The salient facts of both cases are not in dispute and we will briefly set them forth here. In case No. 01—CF—3161, Officer Steven Stemmet of the Aurora police department testified at the evidentiary hearing that around 3:22 p.m. on November 11, 2001, he saw defendant's car fail to come to a complete stop at a stop sign. He also observed that defendant's car had a license plate placed on the dashboard. Stemmet effected a traffic stop, approached the car, which was driven by defendant, and asked for defendant's driver's license and proof of insurance. Stemmet returned to his squad car and ran a computer check on defendant. He found that there were no outstanding warrants, returned to defendant's car, and informed defendant that he was going to write him two citations. Stemmet testified that he did not see any criminal activity at that time. Stemmet asked defendant what he wanted to post as bond, but defendant never answered because Stemmet also asked defendant if he had anything illegal in the car. Defendant responded no, and Stemmet then asked for consent to search his car. After receiving consent, Stemmet searched the car and found a loaded Smith and Wesson .40-caliber handgun under the driver's seat.

Upon reconsideration, the trial court noted that *White* held that, while a police officer making a lawful stop of a motorist is not precluded from making reasonable inquiries concerning the purpose of the stop, the scope of the activities and questioning by the police during an investigatory detention must be reasonably related to the circumstances that initially justified the stop. The court further noted that *White* held that questioning wholly unrelated to the purposes of the stop that is reasonably calculated to elicit incriminating responses is impermissible unless supported by independent, reasonable, and articulable suspicion. In applying these principles to the facts, the trial court found that the request for consent to search was totally unrelated to the traffic offense, which was the basis for the stop, and that the request was calculated to elicit an incriminating response. The court also found that there was no independent, reasonable, and articulable suspicion to form the basis for the request to search. Accordingly, the trial court concluded that defendant's fourth amendment rights were violated and the court granted defendant's motion to suppress.

In case No. 01—CF—3614, defendant first testified at the evidentiary hearing that at approximately 7:15 p.m. on December 15, 2001, he was driving in Aurora and was pulled over by an unmarked Aurora police car and subsequently placed under arrest. Defendant stated that he turned his turn signal on approximately 1,000 feet prior to making the turn. Officer Jeff Wiencek next testified that he observed defendant's car make a turn without activating its turn signal within 100 feet prior to turning. While Wiencek and his assistant, Officer Knepp, ran a license plate check, defendant, the driver of the car, walked to a unit four houses away and returned to the car. By that point, the license plate information returned and Wiencek went over to the car to speak with defendant. The car had stopped in the driveway before the officers had an opportunity to activate their lights and pull the car over. Other than the traffic violation, Wiencek had not seen defendant commit any other crimes. Wiencek and Knepp also wanted to speak with defendant because they considered defendant's actions to be suspicious. Wiencek testified that defendant had parked his vehicle at a house in an area where there were gang problems. Further, defendant also acted suspiciously when he walked four houses away from where he parked, looked at the officers as he walked away, and stood by the door of a residence for a moment before he walked back to his car. Because he felt this behavior was suspicious, Wiencek wanted to see whether there was any ongoing criminal activity other than the failure to properly signal a turn within 100 feet of an intersection. As defendant returned to the car, Wiencek approached him and

asked what he was doing. Defendant replied that he was looking for somebody, but would not give the person's name or address. Wiencek asked defendant for identification and defendant gave him an identification card. Also, during the conversation, the officers asked defendant if they could look in his car. Wiencek stated that the gang activity in that area was the reason why he wanted to investigate defendant. Wiencek admitted that he had not seen anything that made him think that defendant had a gun. During his search, Knepp located two bags of cocaine. The traffic citation was not written until defendant was placed in custody and had been transported to the police station.

Upon reconsideration, based on *White*, the trial court found that the request to search was totally unrelated to the traffic offense, which was the basis for the stop, and that the request was calculated to elicit an incriminating response. The court further found that no evidence was presented to determine the nature of any gang-related problems and that it was not uncommon for people to look at the police to see what they were doing. As such, the court concluded that no independent, reasonable suspicion had been articulated that could form the basis for requesting permission to search the car. Accordingly, the court concluded that defendant's fourth amendment rights were violated, and it reversed its previous order and granted defendant's motion to suppress.

## ANALYSIS

The State contends on appeal that the trial court erred in applying *White* and granting defendant's motions to quash arrest and suppress evidence. Essentially, the State argues that *White* holds that an officer cannot properly ask the defendant for permission to search his car, unless that request is based on something related to the initial traffic stop or, alternatively, is based on some other criminal activity observed by the officer. The State points out that in certain cases an officer may ask for permission to search a vehicle, even though such a request is unsupported by probable cause. See, *e.g., United States v. Childs*, 277 F.3d 947, 950-51 (7th Cir. 2002). The State fears that *White* will be increasingly expanded by the trial courts, as the trial court did in this appeal, in an almost "talismanic manner" to create a *per se* rule. The State argues that such an analysis carries *White* beyond the parameters of the problem that arose in that particular case and creates a wholly unrealistic situation for police officers in traffic stop cases. The State asserts that *White* should be limited to its facts in order to strike a better balance between protecting citizens from unwarranted interference with their privacy and serving their interests in the efficient and

effective prevention and detection of crime. The State asks us to reexamine our decision in *White* in light of its argument. Finally, the State requests that we reexamine *White* in light of the recent Illinois Supreme Court opinion of *People v. Gonzalez*, 204 Ill. 2d 220 (2003), and "make whatever adjustments and modifications that are necessary." Accordingly, a brief overview of *White* and *Gonzalez* is necessary for the disposition of this appeal.

In *White*, an officer pulled the defendant over for failing to signal a lane change and the officer observed a lawn mower and weed whacker in the back of the defendant's station wagon. The officer asked to see the defendant's driver's license and proof of insurance and informed him of the reason for the stop. The officer then asked the defendant if he had any receipts for the items. The defendant gave him the receipts, and the officer observed that the name on the receipts was different from that of the defendant. The officer inquired about the name on the receipts and asked the defendant where the items came from. Additional statements made by the defendant regarding the ownership and possession of the items, and a further check of the car during the computer check, subsequently revealed that the defendant had forged a check in order to obtain the lawn mower and weed whacker. *White*, 331 Ill. App. 3d at 25-26.

Under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), a dual analysis is applied in determining whether a traffic stop implicates the fourth amendment. The first prong concerns whether the officer's action in stopping the vehicle was justified at its inception. The second prong considers whether the officer's conduct following the stop was reasonably related in scope to the circumstances that justified the interference in the first place. In *White*, we were concerned with the scope of the detention and whether the questioning about the items in the back of the station wagon was reasonably related in scope to the circumstances that justified the interference in the first place, absent reasonable suspicion to conduct this type of questioning. *White*, 331 Ill. App. 3d at 28. Based on our review of the relevant case law, we held:

> "While a police officer making a lawful stop of a motorist is not precluded from making reasonable inquiries concerning the purpose of the stop, the scope of the activities and questioning by the police during an investigatory detention must be reasonably related to the circumstances that initially justified the stop. [Citation.] An officer may expand the scope of his detention beyond that which is reasonably related to the circumstances only when the officer has a reasonable and articulable suspicion that other criminal activity may be afoot or where matters that arise during the course of the

stop cause the officer reasonable suspicion. [Citation.] Questioning wholly unrelated to the purposes of the stop, which is reasonably calculated to elicit incriminating responses, is impermissible unless supported by independent, reasonable, and articulable suspicion." *White*, 331 Ill. App. 3d at 34.

In applying the law to the facts, we found that the officer's questions regarding the ownership of the items in the car were intrusive, calculated to elicit possibly incriminating responses, wholly unrelated to the purpose of the traffic stop, and unsupported by independent, reasonable suspicion. We further found that the defendant was doing nothing unusual to indicate that other criminal activity was afoot. Accordingly, we affirmed the trial court's suppression order. *White*, 331 Ill. App. 3d at 35.

In April 2003, one year after *White* was decided, the supreme court in *Gonzalez* conducted a thorough analysis to determine when and to what extent a police officer's conduct following a traffic stop satisfies the second prong of the *Terry* test. In *Gonzalez*, the officer stopped a car, in which the defendant was the passenger, for not having a front license plate. The officer approached the car on the passenger's side. He observed no criminal conduct by the defendant either before or immediately after the stop, and asked him for identification. The defendant complied. Thereafter, the officer ran a criminal history check of the defendant. The ensuing encounter between the officer and the defendant resulted in a search of the defendant's person, revealing a packet of cocaine. The defendant filed a motion to quash arrest and suppress evidence. The trial court concluded that, absent any suspicion of criminal conduct by the defendant, the officer's request for identification was unreasonable. On appeal to the supreme court, the defendant's sole contention was that the officer had no lawful basis to ask him for identification.

The supreme court first discussed at length the divergence of opinion among the federal and state courts regarding the parameters of the *Terry* "scope" requirement when determining the propriety of police questioning during a traffic stop. See *Gonzalez*, 204 Ill. 2d at 229-32. The supreme court noted that our appellate court also has not been uniform in its approach when determining the permissible scope of police questioning during a traffic stop. *Gonzalez*, 204 Ill. 2d at 232. In particular, the supreme court cited *White* and noted the fact that we applied the *Terry* framework in a manner similar to the approach adopted by one of the divergent federal courts with which *Gonzalez* disagreed. *Gonzalez*, 204 Ill. 2d at 232; see *United States v. Holt*, 229 F.3d 931 (10th Cir. 2000), *rev'd upon rehearing en banc*, 264 F.3d 1215 (10th Cir. 2001).

■ The supreme court concluded that the divergent approaches taken by various districts of the appellate court do not strike "the proper balance between the government's interest in effective law enforcement and the individual's interest in being free from arbitrary governmental intrusions, which lies at the core of the concept of 'reasonableness.' " *Gonzalez*, 204 Ill. 2d at 233. Accordingly, in determining whether police questioning during the course of a traffic stop satisfies the second prong of the *Terry* analysis, the court formulated the following framework:

> "[W]e must consider, as an initial matter, whether the question is related to the initial justification for the stop. If the question is reasonably related to the purpose of the stop, no fourth amendment violation occurs. If the question is not reasonably related to the purpose of the stop, we must consider whether the law enforcement officer had a reasonable, articulable suspicion that would justify the question. If the question is so justified, no fourth amendment violation occurs. In the absence of a reasonable connection to the purpose of the stop or a reasonable, articulable suspicion, we must consider whether, in light of all the circumstances and common sense, the question impermissibly prolonged the detention or changed the fundamental nature of the stop." *Gonzalez*, 204 Ill. 2d at 235.

In applying the *Gonzalez* framework, the court held that the officer's request for identification from the defendant did not render the defendant's otherwise lawful detention unreasonable. The stop of the vehicle was based on the officer's observation that the front license plate was missing, which was a violation of our vehicle code. The defendant, who was not implicated in the code violation and who was not suspected of any other wrongdoing, was a passive occupant, and therefore, the request for identification was not directly related to the initial justification for the stop and was not otherwise supported by a reasonable, articulable suspicion of criminal activity. *Gonzalez*, 204 Ill. 2d at 235-36. The officer's question, however, "did not run afoul of the fourth amendment." *Gonzalez*, 204 Ill. 2d at 236. The request for identification was made during the course of the stop while the driver was being questioned by another officer and did not impermissibly prolong the defendant's detention, nor did the question change the fundamental nature of the stop. The court concluded that the question was a simple request for identification that was "facially innocuous" and did not suggest "official interrogation" nor was it the "type of question or request that would increase the confrontational nature of the encounter." *Gonzalez*, 204 Ill. 2d at 236.

■ Although *Gonzalez* did not expressly overrule *White*, it is clear

that *Gonzalez* has explicitly formulated the framework to be employed by our courts in determining whether police questioning during the course of a traffic stop implicates the fourth amendment. At the time of the trial court's decision in the present case, *Gonzalez* had not yet been filed, and ordinarily, we would reverse and remand to the trial court for consideration in light of *Gonzalez*'s recent pronouncement. However, because the parties do not dispute the facts and the ultimate question posed by the legal challenge to the trial court's rulings is reviewed *de novo*, we can decide the matter in this court. See *Gonzalez*, 204 Ill. 2d at 223.

■ We note that, while the State argues that we should reexamine *White* in light of *Gonzalez* and asserts that the facts in the present cases are different from those in *White*, the State fails to argue how the facts here satisfy the *Terry* scope requirements set forth in *Gonzalez*, such that the interrogations in each case did not run afoul of defendant's fourth amendment rights. The State therefore has waived the right to challenge the trial court's holding that the officers' interrogations violated defendant's fourth amendment rights.

Even without waiver, however, the application of the principles espoused in *Gonzalez* to the present cases would lead us to conclude that the trial court's rulings were correct. In case No. 01—CF—3161, the initial justification for the stop was the failure to stop at a stop sign and improper display of a license plate, violations of our vehicle code. Stemmet did not observe any criminal activity but asked defendant if there was anything illegal in his car. Thus, the question posed to defendant was not directly related to the initial justification for the stop and was not otherwise supported by a reasonable, articulable suspicion of criminal activity. Unlike *Gonzalez*, where the officer made a simple request for identification, which the court termed "facially innocuous," here, the officer asked defendant if there was anything illegal in his car. This question had no reasonable connection to the purpose of the stop and served only to prolong the detention of the vehicle and to change the fundamental nature of the stop into one that would increase the confrontational nature of the encounter.

An even stronger argument could be made in case No. 01—CF—3614. The initial justification for the traffic stop was the failure to signal within 100 feet of a turn. The officer here did nothing expected of an officer during the normal course of a traffic stop. Wiencek approached defendant and asked for identification, which defendant provided, but did not check on defendant's status. Instead, Wiencek treated the encounter as a criminal investigation simply because defendant was in an area known to have gangs and because defendant parked in a driveway four doors away from another residence and

watched the police as he returned to his car. The trial court did not find this behavior suspicious and found that no independent, reasonable suspicion had been articulated that could form the basis for requesting permission to search the car, and the State does not refute this finding. It is clear that Wiencek was not interested in treating the encounter as a traffic stop. Although the initial stop was justified as a violation of our vehicle code, the request to search the car violated defendant's fourth amendment rights. The request to search not only prolonged any legitimate detention of the car to investigate a traffic violation, but also changed the fundamental nature of the stop to a search for a violation of our criminal code. Wiencek's interest in searching the car, and his conversation with defendant about being in a gang-related neighborhood, showed that his intent was to conduct a criminal investigation. In addition, the fact that Wiencek waited until he arrived at the police station to write the traffic citation suggests that the initial justification for the stop was mere pretense.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

HUTCHINSON, P.J., and GILLERAN JOHNSON, J., concur.